In re Brenda D. SAVAGE, Debtor.

Educational Credit Management
Corporation, Appellant,

v.

Brenda D. Savage, Appellee.

BAP No. MB 04–004.
Bankruptcy No. 03–11025–CJK.
Adversary No. 03–01367.

United States Bankruptcy Appellate Panel
of the First Circuit.

July 22, 2004.

John F. White, Quincy, MA, on brief, for Appellant.

Joel Jay Rogge, Ipswich, MA, on brief, for Appellee.

Before LAMOUTTE, HAINES and KORNREICH, United States Bankruptcy Appellate Panel Judges.

HAINES, Bankruptcy Judge.

Educational Credit Management Corporation ("ECMC") appeals from an order of the United States Bankruptcy Court for the District of Massachusetts discharging all but $3,120 of the debtor's student loan obligations to ECMC under 11 U.S.C. § 523(a)(8). Because we conclude that the Debtor did not sustain her burden of establishing that excepting the debt from discharge would impose an undue hardship, we **REVERSE** the decision of the bankruptcy court.

## JURISDICTION

■ A bankruptcy appellate panel may hear appeals from "final judgments, orders and decrees [pursuant to 28 U.S.C. § 158(a)(1) ] or with leave of the court, from interlocutory orders and decrees [pursuant to 28 U.S.C. § 158(a)(3) ]."

*Fleet Data Processing Corp. v. Branch (In re Bank of New England Corp.)*, 218 B.R. 643, 645 (1st Cir. BAP 1998). "A decision is final if it 'ends the litigation on the merits and leaves nothing for the court to do but execute the judgment.'" *Id.* at 646 (citations omitted). The bankruptcy court's order determining the dischargeability of the Debtor's student loan obligations is such a final order. *See id.* at 646–47; *see generally T I Fed. Credit Union v. DelBonis*, 72 F.3d 921 (1st Cir. BAP 1995).

## STANDARD OF REVIEW

■ We evaluate the bankruptcy court's findings of fact under the "clearly erroneous" standard and its conclusions of law *de novo*. *See Grella v. Salem Five Cent Savings Bank*, 42 F.3d 26, 30 (1st Cir.1994); *see also Palmacci v. Umpierrez*, 121 F.3d 781, 785 (1st Cir.1997). Several circuits have concluded that § 523(a)(8)'s "undue hardship" determination is a question of law that triggers *de novo* review.[1] Neither the First Circuit nor this appellate panel has addressed the point. Here, both parties agree to *de novo* review of the bankruptcy court's undue hardship conclusion, so we will provide it without further inquiry. Of course, we will review the underlying factual findings for clear error.

## BACKGROUND

On February 10, 2003, Brenda Savage filed a voluntary petition under Chapter 13 of the United States Bankruptcy Code.[2]

---

1. *See, e.g., U.S. Dept. of Educ. v. Gerhardt (In re Gerhardt)*, 348 F.3d 89 (5th Cir.2003); *Brightful v. Pa. Higher Educ. Assistance Agency (In re Brightful)*, 267 F.3d 324, 327 (3d Cir.2001); *Rifino v. United States (In re Rifino)*, 245 F.3d 1083, 1087 (9th Cir.2001); *Tennessee Student Assistance Corp. v. Hornsby*, 144 F.3d 433, 436 (6th Cir.1998); *Woodcock v. Chemical Bank (In re Woodcock)*, 45 F.3d 363, 367 (10th Cir.1995), *cert. denied*, 516 U.S. 828, 116 S.Ct. 97, 133 L.Ed.2d 52 (1995); *In re Roberson*, 999 F.2d 1132, 1134 (7th Cir.1993); *Brunner v. New York State Higher Educ. Serv. Corp.*, 831 F.2d 395, 396 (2d Cir.1987).

2. All references to the "Bankruptcy Code" and all references to specific statutory sections are to the Bankruptcy Reform Act of 1978, as amended, 11 U.S.C. § 101, *et seq.*

The case was subsequently converted to Chapter 7. Thereafter, Ms. Savage initiated an adversary proceeding seeking discharge of her student loan obligations to ECMC.

By the time of trial, Ms. Savage's student loan obligations, now owed to ECMC, consisted of five separate loans on which she owed $32,248.45 in total, including principal, interest and collection costs. Under amortization schedules running from fifteen to thirty years, Ms. Savage could repay all five loans with monthly payments ranging from $327.05 to $259.45.[3] Under a federal program designed to assist student loan debtors (the William D. Ford Loan Consolidation Program), Ms. Savage could consolidate her loans and restructure her payments. Under the Ford Program option, her initial loan payments would be approximately $221 per month, subject to upward adjustments after two years.

Ms. Savage is a 41–year old single woman and is in good health. She attended college in the mid–1980's, but did not graduate. She resides with her fifteen year old son in an apartment, the cost of which is subsidized through the Section 8 housing plan. Her son attends private school at Boston Trinity Academy.

Ms. Savage has been employed by Blue Cross Blue Shield of Massachusetts since September 1999. At the time of trial, she worked an average of 37.5 hours per week, earning approximately $38,328.10 gross annually. According to her Schedule I, her monthly gross wages were $3,079.79. She also earned sundry employment benefits, including health insurance, dental insurance, life insurance, 401(k) plan, three weeks paid vacation and paid personal days. After deductions, her net monthly income was $1,850.12. In addition, she received monthly child support income of $180.60. Thus, Ms. Savage's total net monthly household income was approximately $2,030.72.

Ms. Savage's Schedule J, filed on March 10, 2003, listed monthly expenses of $1,725.74. Her amended Schedule J, filed December 8, 2003, listed expenses totaling $2138.44. The amended schedule itemized, among other things, $607 for rent, $221 for utilities, $76 for telephone, $23.99 for internet connection, $430 for food, $75 for clothing, $12.50 for laundry and dry cleaning, $23 for out of pocket medical expenses, $95.50 for transportation, $193.50 for charitable contributions, $43 for entertainment, $277.50 for her son's tuition at Boston Trinity Academy and $50 for her son's school books.

Employing a "totality of the circumstances" analysis to determine undue hardship, the bankruptcy court concluded "... it is reasonable that Ms. Savage pay $30 per week for two years, roughly, in order to satisfy a portion of the student loan debt." It entered judgment discharging all but $3,120 of the amount owing to ECMC.[4]

## DISCUSSION

### I. Burden of Proof

Under § 523(a)(8), debtors are not permitted to discharge educational loans unless excepting the loans from discharge will impose an undue hardship on

---

3. See Exhibit D–1, App. at 108–09.

4. The bankruptcy court considered all five loans in gross and made an overall downward adjustment to the total amount owing. As neither party objected to that approach, we need not address its correctness. See Grigas v. Sallie Mae Servicing Corp. (In re Grigas), 252 B.R. 866 (Bankr.D.N.H.2000) (analyzing the three approaches to loan dischargeability).

the debtor and the debtor's dependents.[5] The creditor bears the initial burden of proving the debt exists and that the debt is of the type excepted from discharge under § 523(a)(8). *See Bloch v. Windham Prof'ls (In re Bloch)*, 257 B.R. 374, 377 (Bankr.D.Mass.2001) (citations omitted). Once the threshold showing has been made, the burden shifts to the debtor to prove by a preponderance of the evidence that excepting the student loan debt from discharge will cause the debtor and her dependents "undue hardship." *See id.; see also Grogan v. Garner*, 498 U.S. 279, 287, 111 S.Ct. 654, 112 L.Ed.2d 755 (1991) (preponderance of the evidence standard for dischargeability complaints).

## II. Applicable Test for Undue Hardship

■ In determining whether excepting the student loan obligations from discharge would cause Ms. Savage "undue hardship," the bankruptcy court applied the "totality of the circumstances" test. ECMC ascribes error to the court's choice of tests, contending that it should have employed the so-called *Brunner* test.[6] ECMC has, however, waived this argument. Expressly, and without protest, it argued the "totality of the circumstances" in its trial brief, the parties' joint pretrial statement, and at trial. It is now too late to press the point. *See Fleet Mortg. Group, Inc. v. Kaneb*, 196 F.3d 265 (1st Cir.1999) (appellate court will not address issues raised for the first time on appeal). The issue is not properly before us.

## III. Undue Hardship: "Totality of the Circumstances"

■ Under "totality of the circumstances" analysis, a debtor seeking discharge of student loans must prove by a preponderance of evidence that (1) her past, present, and reasonably reliable future financial resources; (2) her and her dependents' reasonably necessary living expenses, and; (3) other relevant facts or circumstances unique to the case prevent her from paying the student loans in question while still maintaining a minimal standard of living, even when aided by a discharge of other pre-petition debts. *See Kopf*, 245 B.R. at 739.

### A. Past, Present and Reasonably Reliable Future Income.

■ The debtor must show not only that her current income is insufficient to pay her student loans, but also that her prospects for increasing her income in the future are too limited to afford her sufficient resources to repay the student loans

---

**5.** Section 523(a)(8) provides:

 (a) A discharge under section 727, 1141, 1228(a), or 1328(b) of this title does not discharge an individual debtor from any debt—

 (8) for an educational benefit, overpayment or loan made, insured or guaranteed by a governmental unit, or made under any program funded in whole or in part by a governmental unit or nonprofit institution, or for an obligation to repay funds received as an educational benefit, scholarship or stipend unless excepting such debt from discharge under this paragraph will imposed an undue hardship on the debtor and the debtor's dependents.

11 U.S.C. § 523(a)(8).

**6.** The *Brunner* test differs, albeit modestly, from the "totality of the circumstances" test. *See Kopf v. United States Dep't of Educ. (In re Kopf)*, 245 B.R. 731 (Bankr.D.Me.2000) (comparing tests). The *Brunner* test requires a "three-part showing (1) that the debtor cannot, based on current income and expenses, maintain a 'minimal' standard of living for herself or her dependents if forced to repay the loans; (2) that this state of affairs is likely to persist for a significant portion of the repayment period of the student loans; and (3) that the debtor has made good faith efforts to repay the loans." *Brunner v. New York State Higher Educ. Serv. Corp.*, 831 F.2d 395, 396 (2d Cir.1987).

and provide herself and her dependents with a minimal (but fair) standard of living. *See id.* at 745; *see also Burkhead v. United States (In re Burkhead),* 304 B.R. 560, 566 (Bankr.D.Mass.2004); *Bourque v. Educ. Credit Mgmt. Corp. (In re Bourque),* 303 B.R. 548, 550 (Bankr.D.Mass. 2003).

■ Ms. Savage has not demonstrated that her current level of income and future prospects warrant discharge of her loans. Her present income may be insufficient to pay her student loans and still maintain precisely the standard of living she now has. But, as discussed below, we conclude it would enable her to repay the loans without undue hardship. Moreover, the record plainly establishes that her prospects for a steady increase in income over time are promising. She has been steadily employed at the same job and regularly receives annual raises. Nothing indicates change is in the wind. Moreover, Ms. Savage currently works 37½ hours a week,

leaving time for some part-time work (or longer hours at her present job), a possibility that will become more and more practical as her son grows older.

## B. Reasonable Necessary Living Expenses.

To prove undue hardship for purposes of § 523(a)(8), a debtor must show that her necessary and reasonable expenses leave her with too little to afford repayment. The bankruptcy court found Ms. Savage's expenses are "for the most part . . . extremely reasonable. . . . This isn't an example of any lavish lifestyle by any means." App. at 197. Although we agree that Ms. Savage does not live lavishly, we disagree that her expenses demonstrate that repaying her student loans would burden her unduly.

As noted above, Ms. Savage's original Schedule J showed total monthly expenses of $1,725.74, leaving about $300 a month in "disposable income."[7] Seven months la-

---

**7.** In undue hardship analysis, most courts employ the same model as is used to determine "disposable income" for Chapter 13 plan confirmation purposes. *See* § 1325(b)(2); *see, e.g., Sequeira v. Sallie Mae Servicing Corp. (In re Sequeira),* 278 B.R. 861, 865 (Bankr.D.Or. 2001); *Peel v. SallieMae Servicing–Heal Loan (In re Peel),* 240 B.R. 387 (Bankr.N.D.Cal. 1999); *Brown v. Salliemae Servicing Corp. (In re Brown),* 227 B.R. 540 (Bankr.S.D.Cal. 1998). Although the problems are similar (ascertaining whether there are sufficient resources to fund payments), the objects (disposable income for plan confirmations vs. payment without undue hardship) differ. Under § 1325, a debtor is generally not required to alter reasonable lifestyle choices. *See, e.g., In re Woodman,* 287 B.R. 589 (Bankr.D.Me. 2003) (citing Keith M. Lundin, Chapter 13 Bankruptcy § 165.1, at 165–1 (3d ed.2000)); *In re Tibbs,* 242 B.R. 511, 516 (Bankr. N.D.Ala.1999) (court examining disposable income "is not expected to, and should not, mandate dramatic changes in the debtor's lifestyle to fit some preconceived norm for chapter 13 debtors"); *In re Sitarz,* 150 B.R.

710, 718 (Bankr.D.Minn.1993) (when examining disposable income, courts need not require the debtor to lower his expenses to poverty level). The same can be said of § 707(b) analysis, which generally focuses on the availability of sufficient disposable income to fund a Chapter 13 plan.

Under § 523(a)(8), the debtor's lifestyle (particularly expenses) is subjected to more rigid scrutiny. Courts differ on the degree of scrutiny applied, or, more precisely, on how much hardship a debtor can be expected to bear before it becomes "undue." But deference to a debtor's lifestyle choices is, to put it kindly, muted. *See, e.g., In re Mathews,* 166 B.R. 940, 945 (Bankr.D.Kan.1994) ("Ordinary 'garden variety' hardship does not suffice for purposes of § 523(a)(8), and debtor 'must show that the combination of the low income and exceptional circumstances is so severe and oppressive that there is no way that the debtor will ever be able to repay the debt and maintain a minimal standard of living' "); *In re Rappaport,* 16 B.R. 615, 617 (Bankr.D.N.J. 1981) (discharge under § 523(a)(8) requires "total incapacity now and in the future to pay

ter, she amended Schedule J, increasing, her monthly expenses to $2,138.44. The increase is attributable principally to private school expenses and church donations.

## 1. Private School Tuition

 The bankruptcy court determined that "it was reasonable" for the Debtor to send her son to private school "given his difficulties at the Boston public schools" and, therefore, that the tuition was a necessary expense for purposes of § 523(a)(8). App. at 197–98. The record does not sustain that finding.

 A necessary living expense is one the debtor could not cut from the budget and still maintain a minimal standard of living. *See In re Dolan,* 256 B.R. 230, 239 (Bankr.D.Mass.2000) (citing *Lohr v. Sallie Mae (In re Lohr),* 252 B.R. 84, 88–89 (Bankr.E.D.Va.2000)). It is the debtor's burden to prove that expenses are reasonably necessary. *See In re Webb,* 262 B.R. 685 (Bankr.E.D.Tex.2001)

Private school tuition is not *generally* considered a reasonably necessary expense in bankruptcy cases even under the *more liberal* standard applied in the Chapter 13 confirmation context. We recently held so

in a case where the proffered justification for the expense was, if anything, more substantial than that presented here. *See Watson v. Boyajian (In re Watson),* 309 B.R. 652 (1st Cir. BAP 2004) (examining whether debtors' expenses were reasonable and necessary for purposes of § 1325); *see also Webb,* 262 B.R. at 690 (same); *Univest–Coppell Village, Ltd. v. Nelson,* 204 B.R. 497 (E.D.Tex.1996) (same). Although compelling circumstances may distinguish a given case,[8] the authorities uniformly hold that a debtor's mere preference for private schooling is insufficient to qualify the attendant expense as necessary and reasonable.[9]

Ms. Savage did not demonstrate a satisfactory reason why her son needs to attend private school at a monthly cost of $277.50 (plus $50 for books). When asked to explain why she did so, she testified:

> There were a lot of fights, a lot of swearing, a lot of other things going on. I mean he would wake up every morning crying because he didn't want to go to school ... So I had to find a school to put him in ... where he was going to—I mean, he didn't do well that whole year. I had to keep going down to the school

one's debts for reasons not within the control of the individual debtor"); *see also Penn. Higher Educ. Assistance Agency v. Faish (In re Faish),* 72 F.3d 298, 305–06 (debtor entitled to live in something more than "abject poverty," but must show "she could not maintain a minimal standard of living if forced to repay her loans" which is a showing of something more than "tight finances"). Eliminating some expenses that would be considered legitimate under § 1325 might well be done without creating "undue" hardship. *See generally Kopf,* 245 B.R. at 743–44 (discussing the notion of "undue" hardship).

8. In *Webb,* the bankruptcy court found that there was a compelling circumstance for private schooling where the debtor's son had a medically-documented learning disability and a social disorder, and assimilation into the

public school had failed due to the lack of a "therapeutic educational environment." 262 B.R. at 690–91.

9. Absent compelling circumstances, private school tuition is most often considered a luxury expense that amounts to a debtor requiring his or her creditors to donate toward his children's education. *See, e.g., Miller v. U.S. Dep't of Educ. (In re Miller),* 254 B.R. 200 (Bankr.N.D.Ohio 2000) (debtor's student loan debt was nondischargeable under § 523(a)(8) where debtor did not demonstrate a satisfactory reason why her son needed to attend private school); *see also In re MacDonald,* 222 B.R. 69, 76–77 (Bankr.E.D.Pa.1998) (sending child from a suburban environment to a school in New York City for religious education is not a legitimate expense under § 1325).

several times. He was just a mess the whole school year. . . . So I had to find another school.

App. at 172–73. Although we understand why Ms. Savage prefers that her son attend private school, she has not demonstrated that the public school system cannot adequately meet her son's educational needs. Her preference appears sincere, but that alone is not sufficient to sustain the bankruptcy court's implicit conclusion that foregoing this expense would constitute undue hardship within § 523(a)(8)'s meaning.[10]

### 2. Other Expenses

Given the fact that at least $322.50 (private school tuition and books) in expense can be eliminated from Ms. Savage's budget without creating undue hardship, her student loans cannot be discharged under § 523(a)(8). It is worth noting, as well, that Ms. Savage's son will reach majority in just a few years, a consequence that will reduce her required expenses considerably. Moreover, we note that Ms. Savage's budget includes additional discretionary expenses that might, or might not, survive if they were scrutinized under the totality of circumstances test for undue hardship. Those expenses create issues we need not reach today, but their existence demonstrates that, with elimination of the private school expenses, Ms. Savage's budget remains sufficiently malleable to enable her to adjust to the necessity of repaying her student loans.

*Church Donations.* Ms. Savage makes monthly "tithes" to her church of approximately $193. Through the Religious Liberty and Charitable Donation Protection Act of 1998 (the "RLCDPA"), Congress amended several sections of the Bankruptcy Code to exclude "charitable contributions" totaling less than fifteen percent of the debtor's gross annual income from consideration by the bankruptcy courts for various purposes. *See* Pub.L. No. 105–183, 112 Stat. 517. For example, Congress amended § 1325 so that "charitable contributions" could not be considered "disposable income" by the bankruptcy court for plan confirmation purposes. Notably, though, § 523(a)(8) was not one of the Code sections amended by Congress. As a result, there is a split of authority as to whether Congress intended religious and charitable donations to be permissible expenses in determining undue hardship under § 523(a)(8). *Compare Lebovits v. Chase Manhattan Bank (In re Lebovits),* 223 B.R. 265 (Bankr.E.D.N.Y.1998) (tithing was permissible expense under § 523(a)(8)), and *Meling v. United States (In re Meling),* 263 B.R. 275 (Bankr. N.D.Iowa 2001) (monthly tithes of $100 were reasonable for purposes of § 523(a)(8)), with *Educational Credit Mgmt. Corp. v. McLeroy (In re McLeroy),* 250 B.R. 872 (N.D.Tex.2000) (finding that RLCDPA's provisions do not apply to § 523(a)(8)), and *Ritchie v. Northwest Educ. Loan Ass'n (In re Ritchie),* 254 B.R. 913 (Bankr.D.Idaho 2000) (religious tithing excluded from expenses in undue hardship analysis).

■ *401(k) Contributions.* Ms. Savage makes 401(k) contributions of approximately $42 per week. *See* App. at 189. Consistent with the generally prevailing view,[11] the bankruptcy court considered

---

10. The lower court found that the expense was "reasonable." As discussed above, *supra* n. 7, a bare finding of "reasonableness" does not equate with the conclusion that eliminating the expense would amount to undue hardship.

11. This view prevails in plan confirmation contests. *See, e.g., Anes v. Dehart (In re Anes),* 195 F.3d 177, 180–81 (3d Cir.1999); *In re Hansen,* 244 B.R. 799, 801–02 (Bankr.N.D.Ill. 2000); *In re Bell,* 264 B.R. 512 (Bankr.S.D.Ill. 2001) (401(k) contributions are not per se

those contributions as income from which Ms. Savage could pay some portion of her outstanding student loans without undue hardship.[12] We need not address the issue here, but pause only to say that, as with other expenses considered in the totality of pertinent circumstances, courts would do well to analyze each debtor's particular situation carefully. The result may well differ with changes in a debtor's age, accumulated savings, proximity to retirement, and earnings and expense forecast. *See Peel v. SallieMae Servicing–Heal Loan (In re Peel)*, 240 B.R. 387, 392–93 (Bankr. N.D.Cal.1999) (explaining why court should exercise discretion in assaying necessity of retirement savings); *see also In re Bell*, 264 B.R. 512 (Bankr.S.D.Ill.2001) (citing *In re Taylor*, 243 F.3d 124, 129–30 (2d Cir.2001)).

### C. Other Circumstances

Without objection, the bankruptcy court took evidence about the Ford Program, which allows student loans to be consolidated and payments on the consolidated loan to be adjusted based on a formula that takes into account poverty guidelines and a debtor's adjusted gross income. *See* 34 C.F.R. § 685, *et seq.* Under one of the program's student loan consolidation options, a borrower's loan payments start low, then increase gradually every two years (the "graduated plan"). *See* 34 C.F.R. § 685.208(d). The Ford Program also provides borrowers with the ability to obtain deferment and/or forbearance of payment on a consolidated student loan. *See* 34 C.F.R. §§ 685.204 and 685.205.

ECMC notified Ms. Savage of her options under the Ford Program. It informed her that under the graduated plan, her total student loan payment would be approximately $221 per month for the first two years. Ms. Savage conceded such programs were available to her and raised no objection to considering them in the § 523(a)(8) calculus. *Cf. Kopf*, 245 B.R. at 734–35.

The bankruptcy court did not expressly evaluate the Ford Program's availability or the propriety of factoring it (with its loan consolidation requirements) into the totality of circumstances. In any event, we are satisfied that, with or without the program's benefits, the record compels the conclusion that Ms. Savage has now (and will increasingly have) the ability to repay her five student loans without undue hardship.

### CONCLUSION

The bankruptcy court's order discharging all but $3,120 of the student loan obligations to ECMC is **REVERSED** and the

---

reasonably necessary for the support or maintenance of a debtor or the debtor's dependents and, thus, constitute disposable income to be paid to creditors under § 1325(b)(2)); *In re Nation*, 236 B.R. 150, 152 (Bankr. S.D.N.Y.1999); *In re Cornelius*, 195 B.R. 831, 835 (Bankr.N.D.N.Y.1995); *In re Cavanaugh*, 175 B.R. 369, 373 (Bankr.D.Idaho 1994) (contributions to 401(k) plan must be included in disposable income); *In re Fountain*, 142 B.R. 135, 137 (Bankr.E.D.Va.1992) (contributions to pension fund must be included in disposable income). The principle should generally hold true under the more rigid scrutiny imposed by courts making "undue hard-

ship" determinations. *See, e.g., Dolan*, 256 B.R. at 239 (paying student loans may preclude debtor from making other expenditures he considers necessary, such as providing for retirement, but "the debtor's inability to afford such things ... does not diminish the debtor's present standard of living.").

12. It noted that "[t]he only place in which there is some ability to pay is that 401(k) payment, and I think it reasonable that the debtor make some payment over time in connection with the educational loans essentially out of that 401(k)." App. at 198–99.

matter is **REMANDED** for entry of judgment in ECMC's favor.